O

**UNITED  STATES  DISTRICT  COURT**

**FOR  THE  CENTRAL  DISTRICT  OF  CALIFORNIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **CASE NO. CR 02-938 DOC** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **6) RONALD BOYD SLOCUM, aka** | ) | **O R D E R  RE: REQUESTS FOR JURY** |
| **"Slo," aka "McKool;"** | ) | **INSTRUCTIONS ON VARIOUS** |
| **13) WAYNE BRIDGEWATER;** | ) | **DEFENSES** |
| **31) HENRY MICHAEL HOUSTON,** | ) | |
| **aka "Tweek,"** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

**I.    Introduction**

Before the Court are the following matters relating to proposed jury instructions on various defenses asserted by Defendants Houston and Bridgewater: (1) Government's Motion in Limine to Preclude Duress Defense and Request for Jury Instruction ("Duress Motion"); (2) Defendant Bridgewater's Proposed Self-Defense Instruction ("Self-Defense Request"); and (3) Defendant Houston's Motion in Limine Requesting the Jury be Instructed on Self-Defense and Defense of Others ("Self-Defense Motion").  The Duress Motion, filed on April 1, 2007, seeks an order precluding Defendants from arguing a duress defense in this case and requests a jury instruction prohibiting a duress defense.  The Self-Defense Request, filed on April 2, 2007, asks

1    that the Court allow jury instructions on self-defense and defense of others as to racketeering

2    acts thirty-eight and thirty-nine of count one, as well as to counts six and seven.  The Self-

3    Defense Motion filed on April 3, 2007, asks for jury instructions on self-defense, defense of

4    others, and imperfect self defense.  As the motions raise substantially the same issues, the Court

5    rules on them together.  After considering all of the papers filed in support of and in opposition

6    to these motions, as well as the oral arguments of the parties, the Court rules as follows.

7    **II.    Facts and Charges**

8          The First Superceding Indictment ("FSI") alleges that Defendants Houston and

9    Bridgewater were members of the Aryan Brotherhood ("A.B.") prison gang and that they

10   participated in an attack on black inmates at the United States Penitentiary ("USP") at

11   Lewisburg, Pennsylvania, on August 28, 1997.  FSI at ¶ 282-86.  The evidence established

12   Bridgewater as a longtime and influential member of the A.B.  There was also evidence that

13   Houston was associated with the A.B. for years prior to the attacks and was made an A.B.

14   member mere hours before, and in contemplation of, the attacks.

15         The evidence presented at trial revealed the following details of the attacks and the events

16   preceding them.  High-ranking A.B. members Barry Mills and Tyler Bingham sent a message,

17   written in invisible ink, to A.B. member Allen Benton at USP Lewisburg, ordering him to attack

18   inmates there as part of a nationwide war between the A.B. and a rival gang, the "D.C. Blacks."

19   Benton received the message on August 28, 1997, and recruited Defendants Houston and

20   Bridgewater to participate in the attacks.  Hours passed during which time Bridgewater recruited

21   two additional inmates, and also retrieved prison-made knives to use in the attacks.  Meanwhile,

22   Houston snuck from cell block B to cell block A, where the stabbings would later take place.

23   That evening, Defendants and the others participated in a knife attack on five black inmates and

24   one white inmate, leaving two dead and the others severely wounded.  Defendant Houston, along

25   with Benton, personally stabbed and killed Abdul Salaam.  Salaam suffered thirty-four stab

26   wounds, sixteen of which were fatal.  Defendant Bridgewater personally stabbed and killed

27   Frank Joyner.  Joyner was stabbed thirty-five times, with six fatal wounds.  The evidence shows

28   that the victims were unarmed and in non-aggressive postures at the time of the attacks.  Salaam

2

1  was lying on a bunk and Joyner was playing monopoly with two of the other victims. There is

2  no evidence that the victims ever assaulted or threatened Defendants. Immediately after the

3  stabbings, Defendants discarded their weapons.

4      Count one charges Defendants with racketeering in violation of 18 U.S.C. § 1962(c) and

5  includes racketeering act thirty-eight for the murder of Joyner and racketeering act thirty-nine

6  for the murder of Salaam. Counts six and seven charge Defendants with violent crime in aid of

7  racketeering ("VICAR"), in violation of 18 U.S.C. § 1959, for the killings of Joyner and Salaam.

8  The Government seeks the death penalty against Defendants on counts six and seven.

9  ## III.   Legal Standard

10      "As a general proposition a defendant is entitled to an instruction as to any recognized

11  defense for which there exists evidence sufficient for a reasonable jury to find in his favor."

12  *Mathews v. United States*, 485 U.S. 58, 63, 108 S. Ct. 883 (1988) (*citing Stevenson v. United*

13  *States*, 162 U. S. 313, 16 S. Ct. 839 (1896)). A jury instruction should be given if "there is any

14  foundation in the evidence [to support the instruction], even though the evidence may be weak,

15  insufficient, inconsistent or of doubtful credibility." *United States v. Sanchez-Lima,* 161 F.3d

16  545, 549 (9th Cir. 1998).

17      The "merest scintilla of evidence" is insufficient to support giving an instruction. *United*

18  *States v. Wagner*, 834 F.2d 1474, 1486 (9th Cir. 1987). Instead, an instruction "must be given if

19  there is evidence upon which the jury could rationally sustain the defense. This standard

20  protects the right of the defendant to have the jury weigh the evidence and the credibility of the

21  witnesses when the evidence raises a factual dispute and, at the same time, protects against

22  improper verdicts." *Id.* (internal quotation marks and citation omitted). In Pennsylvania,

23  "[b]efore the issue of self-defense may be submitted to a jury for consideration, a valid claim of

24  self-defense must be made out as a matter of law, and this determination must be made by the

25  trial judge." *Commonwealth v. Mayfield*, 401 Pa. Super. 560, 564 (1991). "Such claim may

26  consist of evidence from whatever source. 'Such evidence may be adduced by the defendant as

27  part of his case, or conceivably, may be found in the Commonwealth's own case in chief or be

28  elicited through cross-examination.'" *Id.* (*quoting Commonwealth v. Rose*, 457 Pa. 380, 389

1  (1974)).

2  **IV.    Self-Defense**

3        **A.    Count One**

4              **1.    Applicable Law**

5        Racketeering acts thirty-eight and thirty-nine charge Defendants with violations of the

6  Pennsylvania murder statute, 18 Pa. Cons. Stat. § 2502.  The RICO statute defines "racketeering

7  activity" to include "any act or threat involving murder . . . which is chargeable under State law

8  and punishable by imprisonment for more than one year . . . ."  18 U.S.C. § 1961.  Although a

9  murder is technically "chargeable under State law" if an affirmative defense exists, such a

10  murder would not be "punishable" at all.  The Court must therefore look to Pennsylvania law in

11  assessing those defenses raised against racketeering acts thirty-eight and thirty-nine.  *See United*

12  *States v. Muskovsky*, 862 F.2d 1319, 1330-31 (7th Cir. 1988) ("state *substantive* defenses are

13  incorporated into federal law for purposes of RICO") (emphasis in original); *see also United*

14  *States v. Carrillo*, 229 F.3d 177, 183-86 (2d Cir. 2000) (discussing hypothetical case where

15  defendant charged with RICO based on state law racketeering act of murder asserts self-

16  defense).

17              **2.    Legal Standard**

18        To establish a *prima facie* case of self-defense in Pennsylvania, a defendant must point to

19  evidence supporting three elements:

20        a) the slayer was free from fault in provoking or continuing the difficulty which
          resulted in the slaying; b) that the slayer must have reasonably believed that he was
21        in imminent danger of death or great bodily harm, and that there was a necessity to
          use such force in order to save himself therefrom; and c) the slayer did not violate
22        any duty to retreat or to avoid the danger.

23  *Commonwealth v. Black*, 474 Pa. 47, 53 (1977) (construing 18 Pa. Cons. Stat. § 505(b)).

24              **3.    Analysis**

25        Defendants contend that a state of war existed between the A.B. and the D.C. Blacks at

26  the time of the Lewisburg killings.  Based on this contention, Defendants assert that they killed

27  Joyner and Salaam in self-defense because they reasonably believed the D.C. Blacks would kill

28

4

1  them had they not struck first.[1]

2            **a.     Defendants were the Aggressors**

3        To make out a case of self-defense, a defendant must show that he "was free from fault in

4  provoking or continuing the difficulty which resulted in the slaying." *Id.*  As stated in §

5  505(b)(2), "[t]he use of deadly force is not justifiable . . . if . . . the actor, with the intent of

6  causing death or serious bodily injury, provoked the use of force against himself in the same

7  encounter." 18 Pa. Cons. Stat. § 505(b)(2).  "Thus, in order to find that the defendant had

8  forfeited his right to self-defense pursuant to the doctrine of provocation, the facts must support

9  the statutory requirement that the defendant, with the intent of causing death or serious bodily

10  injury, provoked the use of force." *Commonwealth v. Samuel*, 527 Pa. 298, 304 (Pa. 1991).

11  This provocation element involves a determination of "who was the initial aggressor."

12  *Commonwealth v. Brown*, 491 Pa. 507, 513 (1980).

13        Here, the undisputed evidence establishes Defendants as the aggressors.  As noted,

14  Defendants approached the victims armed with prison-made knives while all of the victims were

15  unarmed and in non-aggressive postures at the time of the attacks.  Salaam was lying on a bunk

16  and Joyner was playing monopoly with two of the other victims.  There is no evidence or

17  allegation that either Salaam or Joyner assaulted or threatened Defendants prior to the killings.

18  The requirement that the actor did not "provoke[] the use of force against himself" implies that

19  self-defense is proper only where force was used or threatened against the actor which resulted

20  in the actor's response.  18 Pa. Cons. Stat. § 505(b)(2).  By definition, where a person strikes

21  prior to any aggressive action by the victim, self-defense is unavailable.

22        Defendants contend that the relevant context for their self-defense plea is not simply the

23  —————————————

24      [1] Defendants also argue that they acted in the defense of others, though they do not
25  elaborate on the precise application of this defense.  "The same rules . . . which apply to
  persons acting in self defense apply to persons acting in defense of others.  For the sake of
26  simplification, our analysis of the instant issue will not make continuous references to
  situations involving both self defense and defense of others." *Commonwealth v. French*,
27  531 Pa. 42, 49 (1992).

28

1    time immediately prior to the stabbings, but the larger "war" that existed between the A.B. and

2    the D.C. Blacks in prison at the time.  Under this theory, Defendants argue that this state of war

3    was the inciting circumstance compelling their behavior and maintain that they had no role in

4    instigating the state of war.

5           To accept Defendants' theory would be to embrace a dramatic expansion of the self-

6    defense doctrine.  Civilized society does not recognize self-defense as a justification for murder

7    so that defendants may preemptively strike and kill their enemies, even where the parties have

8    sworn to a pact of mutual destruction, no matter how potentially formidable those enemies may

9    be.  The law most certainly cannot tolerate so incongruous a manipulation of the self-defense

10   doctrine as would be required to sanction fatal, serial attacks against a rival gang where the

11   leadership of the very gang initiating confrontation precipitated the attacks by circulating a

12   declaration of war to its members.  Although the Defendants may have believed that their

13   victims would have attacked them at some point in the future, their argument for self-defense

14   ignores the requirement that the victim must have initiated some forceful action before the

15   privilege of response could arise.  To allow the generalized threat of a gang war to supplant the

16   laws of society is paramount to granting a license that gang members may interpret any action as

17   provocative and may thus attack suspected enemies without bothering to ask questions.  It would

18   essentially be to grant gang members a license to kill each other on sight.

19          Defendants' conduct can most generously be characterized as preventive self-defense, a

20   concept that finds no support in state or federal law.[2]  Preventive self-defense is an offensive

21   concept, properly understood to constitute aggression, and is, in fact, the opposite of defense.  To

22   endorse preventive self-defense in the prison context would be to transform correction

23   institutions into combat zones, in which legal sanction is granted to inmates who would sooner

24   _____

25          [2] Nor is preventive self-defense permissible under international law.  *See*
     International Military Tribunal (Nuremberg) Judgment and Sentences, Oct. 1, 1946,
26   *reprinted in* 41 Am. J. Int'l L. 172, 205 (1947) ("Preventive action in foreign territory is
     justified only in the case of an instant and overwhelming necessity for self-defense,
27   leaving no choice of means and no moment for deliberation.") (internal quotation marks
     omitted).
28

kill a potential enemy than seek assistance from the prison administration. "Under the law of the jungle a good offense may be the best defense. But although prisons are nasty places, they are not jungles – and it is the law of the United States rather than Hobbes' state of nature that regulates inmates' conduct." *United States v. Haynes*, 143 F.3d 1089, 1090 (7th Cir. 1998); *see also* Anthony Simones, *Applying Nineteenth Century Ideas to a Twenty-First Century Problem: The Law of Self-Defense and Gang-Related Homicide*, 20 S. Ill. U. L.J. 589, 604 (1996) (hereinafter "Simones") ("To adopt the law of the jungle is not to refine the concepts of self-defense; it is to abrogate them."). "If prisoners could decide for themselves when to seek protection from the guards and when to settle matters by violence, prisons would be impossible to regulate. The guards might as well throw the inmates together, withdraw to the perimeter, and let them kill one another . . . ." *Haynes*, 143 F.3d at 1091.

The Court finds that no reasonable jury could find that Defendants were not the aggressors in the stabbings.[3]

> **b.    Defendants Did Not Reasonably Believe that they were in Imminent Danger**

A defendant pleading self-defense must also establish that he "reasonably believed that he was in imminent danger of death or great bodily harm, and that there was a necessity to use such force in order to save himself therefrom." *Black*, 474 Pa. at 53. Defendants contend that the message they received informed them that the war had already begun, so that immediate action

---

[3] This conclusion accords with Pennsylvania case law construing the provocation element. *Compare Commonwealth v. Tilley*, 528 Pa. 125, 139 (1991) (denial of request for self-defense instruction was proper where defendant entered home and fatally shot resident because defendant was "unquestionably the aggressor"), *and Commonwealth v. Bracey*, 568 Pa. 264, 285 (2001) (defendant provoked the use of force resulting in the killing when he jumped on the hood of the victim's car and aimed a gun at him), *with Commonwealth v. Brown*, 491 Pa. 507 (1980) (victim was beating defendant's cousin, defendant pulled him away, the victim produced a gun and was shot in a struggle for the gun), *and Commonwealth v. Fisher*, 491 Pa. 231, 237 (1980) (evidence showed defendant "bore no responsibility for provoking the use of force inasmuch as the initial shot was fired without warning by the decedent").

1   was required.  In addition, Defendants ask that we consider the killings in the light of prior

2   attacks by black inmates on white inmates in 1996 and 1997 at USP Lewisburg and USP

3   Marion, arguing that such attacks are relevant to show the reality of the threat posed by the D.C.

4   Blacks and the need for swift action.  Defendants also argue that a variety of circumstantial

5   evidence illustrates imminence: (1) Benton's involvement in the stabbings because high-ranking

6   A.B. members generally avoided dirtying their hands in violence; (2) Bridgewater's involvement

7   because he was soon to be released from prison; (3) the fact that Defendants observed that a

8   D.C. Black was missing from his cell; (4) that weeks earlier the warden at USP Lewisburg had

9   told Benton he did not want a "bloodbath;" (5) testimony that over 90% of inmates had access to

10  weapons; and (6) Defendants' belief that A.B. members at Marion had already been attacked

11  weeks prior.

12       None of these allegations supports a finding of imminent danger.  At best they support a

13  finding of later danger.  But "later and imminent are opposites."  *Haynes*, 143 F.3d at 1090

14  (internal quotations omitted).  Several hours passed between the time Defendants learned of the

15  alleged war and the time of the stabbings.  Further, the victims were unarmed when they were

16  stabbed.

17       In *Commonwealth v. Grove*, 363 Pa. Super. 328, 334 (Pa. Super. Ct. 1987), the

18  Pennsylvania Superior Court discussed the imminence requirement.  There, the defendant shot

19  her husband while he slept, doused him with gasoline, and ignited his body.  The defendant

20  relied on a self-defense theory, arguing that her husband had physically abused her and her

21  children throughout their 22 year marriage, and that she reasonably believed that deadly force

22  was necessary to protect her and her children from death or serious bodily injury.  The court

23  found that "self-defense was not properly at issue because there was no evidence presented to

24  establish that appellant reasonably believed that she or any other person was in imminent danger

25  of death or serious bodily injury on the present occasion when the deadly force was used." *Id*.

26  at 334.  "The victim was not threatening in any manner; rather, it is undisputed that he was drunk

27  and asleep." *Id*. at 336.  The court distinguished other cases involving battered wives, in which

28  it emphasized that there was evidence of a reasonable belief in imminent harm.  In one such

1   case, the defendant "shot her husband only after he had placed his hands around her neck." *Id.*

2   at 336 (quoting *Commonwealth v. Watson*, 494 Pa. 467, 474 (1981)).  In the other, "the

3   defendant stabbed her husband with the kitchen knife that she grabbed to defend herself after he

4   had just beaten her, while he was still in a rage, and as he was coming at her again." *Id.* (citing

5   *Commonwealth v. Zenyuh*, 307 Pa. Super. 253, 256-57 (1982)).

6   The court in *Grove* also addressed the issue of how prior acts of violence by the victim

7   could be relevant in evaluating a defendant's purported belief of imminent danger.  The court

8   noted that, "[w]hile a history of spousal abuse is certainly a factor to be considered in

9   determining whether an accused's alleged fear of imminent death or serious bodily injury is

10  genuine and reasonable, it does not alter the requirement that the threat of death or serious bodily

11  injury be imminent on the present occasion." *Id.* at 336.

12  Similarly, the history of violence between whites and blacks at USP Lewisburg "is a

13  factor to be considered in determining whether [Houston's and Bridgewater's] alleged fear of

14  imminent death or serious bodily injury is genuine and reasonable, it does not alter the

15  requirement that the threat of death or serious bodily injury be imminent on the present

16  occasion." *Id.*

17  The imminence requirement relates to the possibility of peaceful alternatives, but it also

18  relates to the certainty of the threat.  Without imminence, a person perceiving a future threat is

19  uncertain as to whether the threat will actually be carried out.  In this case, there is the added

20  uncertainty of identifying who specifically would strike because Defendants have alleged only a

21  generalized threat from the D.C. Blacks as a whole, rather than a specific threat from Salaam and

22  Joyner as individuals.  To ignore the imminence requirement here would be to permit gang

23  members to strike at any member or associate of an opposing gang based on no more than the

24  fear that harm might, without guarantee, someday arise.  While there has been evidence at trial

25  that might support a finding of fear on the part of these defendants, "[t]he idea of reasonable fear

26  should not be manipulated to sanction wholesale slaughter." *Simones*, *supra*, at 596.

27  Since the circumstances of these killings do not approach the type of imminence required

28  under Pennsylvania case law, the Court concludes that no reasonable jury could find Defendants

1  had a reasonable belief they were in imminent danger of death or great bodily harm.

2  ### c.      Defendants had a Duty to Retreat

3  Finally, the use of deadly force in Pennsylvania is not justified if "the actor knows that he

4  can avoid the necessity of using such force with complete safety by retreating . . . ."  18 Pa.

5  Cons. Stat. § 505(b)(2).  Where a confrontation occurs in an actor's dwelling, he is not obligated

6  to retreat unless he was the initial aggressor.  *Id.*

7  No Pennsylvania case discusses whether a prison qualifies as a dwelling for purposes of

8  analyzing the duty to retreat.  Courts in other states have addressed the question with regard to

9  their own self-defense statutes and unanimously conclude that a prison is not a dwelling.  *See,*

10  *e.g. People v. Scalf*, 1998 Mich. App. LEXIS 853, *5-7 (1998) (analyzing the justification for

11  the "no retreat" rule and determining that the prison was not defendant's "home" under the rule);

12  *State v. McCray*, 312 N.C. 519, 533 (1985) ("the entire Caledonia Prison simply may not be

13  considered as the defendant's 'home' for purposes of the self-defense and defense of one's

14  habitation doctrines"); *State v. Ross*, 1991 Ohio App. LEXIS 5024, *6-7 (1991) (prison is not the

15  defendant's home because "[f]or the purpose of self-defense, a basic tenet of a 'home' is the

16  right to remain there and the right to restrict the entrance of others").

17  The Court believes the Pennsylvania Supreme Court would determine this issue[4] in

18  accordance with the other state courts that have addressed the issue and would conclude that a

19  prison is not a dwelling for purposes of analyzing the duty to retreat.  Even if a prison range

20  were to qualify as a dwelling under § 505(b), there is a duty to retreat from one's dwelling when

21  the actor is the initial aggressor, as already established here.  Therefore, the Court concludes that

22  Defendants had a duty to retreat before using force against the victims if they could have done so

23  safely.

24  The Government contends that Defendants violated their duty to retreat by failing to seek

25  protective custody from the staff at USP Lewisburg.  To counter this, Defendants presented the

26

27  _____

28  [4]A federal court determines issues of state law as it believes the highest court of the state would do so.  *West v. American Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940).

1    testimony of inmates and Bureau of Prisons staff regarding a stabbing that occurred in USP

2    Lewisburg's protective custody unit in April 1997.  There was also testimony that stabbings in

3    that unit were not unusual.  To the extent this evidence shows that the protective custody unit

4    was generally unsafe, Defendants still have not presented any evidence that at the time they were

5    actually aware of any of these stabbings.  Viewing the evidence in the light most favorable to the

6    defense, the Court will nonetheless presume that the violence in the protective custody unit was

7    common knowledge among prisoners at USP Lewisburg and that Defendants learned of such

8    violence through the prison rumor mill.

9           However, the safety of the retreat option is only implicated if an actor's use of force was

10   "necessary."  18 Pa. Cons. Stat. § 505(b)(2) (use of deadly force is not justified if "the actor

11   knows that he can avoid the necessity of using such force with complete safety by retreating").

12   Because the Court has already determined that the use of force was not necessary because any

13   threat to Defendants was not imminent, the evidence regarding the safety of the protective

14   custody unit is not sufficient to permit a jury to rationally sustain the defense.

15          **B.      Counts Six and Seven**

16                  **1.      Legal Standard**

17          Because the VICAR allegations in counts six and seven charge as their predicate acts

18   violations of the federal murder statute, 18 U.S.C. § 1111, federal law governs defenses raised

19   against them.  Under federal law, "to make a prima-facie case of self-defense, a defendant must

20   make an offer of proof as to two elements: (1) a reasonable belief that the use of force was

21   necessary to defend himself or another against the immediate use of unlawful force and (2) the

22   use of no more force than was reasonably necessary in the circumstances." *United States v.*

23   *Biggs*, 441 F.3d 1069, 1071 (9th Cir. 2006).  The defendant need not present evidence that there

24   existed no reasonable alternative to the use of force.  *Id.*  "Force likely to cause death or great

25   bodily harm is justified in self-defense only if a person reasonably believes that such force is

26   necessary to prevent death or great bodily harm."  Ninth Circuit Model Criminal Jury Instruction

27   6.7; *see also United States v. Keiser*, 57 F.3d 847, 851 (9th Cir. 1995) ("[T]he model instruction

28   accurately states the elements of self-defense and defense of another in this Circuit.").  A

1    defendant asserting self-defense must also not have provoked the use of force.  *United States v.*

2    *Wagner*, 834 F.2d 1474, 1486 (9th Cir. 1987) ("One who is the aggressor in a conflict

3    culminating in death cannot invoke the necessities of self-preservation.") (*quoting United States*

4    *v. Peterson*, 157 U.S. App. D.C. 219 (D.C. Cir. 1973)).

5                           **2.     Analysis**

6            Just as Defendants' self-defense claims find no support in Pennsylvania law, they

7    likewise fail under federal law.  First, Defendants' provocation of the use of force is also fatal to

8    their self-defense claims under federal law.  *See Wagner*, 834 F.2d at 1486 (defendant was the

9    aggressor when the victim was unarmed and in retreat); *United States v. Garcia*, 625 F.2d 162,

10   170 (7th Cir. 1980) (although the origins of the inmates' fight were uncertain, it was clear that

11   when the defendants chased their victim down a hall and stabbed him to death, "they were no

12   longer acting in self-defense").

13           In addition, the evidence does not support a finding that Defendants used "no more force

14   than was reasonably necessary in the circumstances."  *Biggs*, 441 F.3d at 1071.  Salaam was

15   stabbed thirty-four times, with sixteen fatal wounds.  Joyner was stabbed thirty-five times, with

16   six fatal wounds.  Indeed, the Court previously allowed the Government to present autopsy

17   photos of the victims for the purpose of illustrating the extent of the force Defendants used.

18           Finally, federal case law regarding the immediacy requirement bolsters the conclusion

19   that Defendants' self-defense claim is not viable.  In *Haynes*, the Seventh Circuit determined that

20   there was no imminent threat justifying the use of force where the facts supporting self-defense

21   were even stronger than they are here.  In that case, the defendant had been subjected to

22   numerous threats by the victim, a fellow inmate who "threatened to make [the defendant] his

23   'bitch' (homosexual plaything)," assaulted the defendant, and told the defendant a day later that

24   he would "finish what he started."  143 F.3d at 1089-90.  The defendant responded to this

25   treatment by pouring hot oil over the victim's head, severely burning him in the process.  *Id*. at

26   1089.  Despite recognizing the general threat that the victim presented to the defendant, the

27   Seventh Circuit labeled the defendant's act as a "preemptive strike" and determined that the

28   circumstances presented not "an imminent use of force," but rather "a threat of later action"

insufficient to justify the use of force.[5]  *Id.* at 1090-91.

Here, the evidence of imminence is even less persuasive than in *Haynes*.  *See United States v. Bello*, 194 F.3d 18 (1st Cir. 1999) (no evidence of immediate danger where defendant committed the assault, in prison, at least 18 hours after the threat).  As noted, after learning of the alleged war, Defendants waited hours before launching their attack.  The victims were unarmed and non-threatening when they were stabbed.

## V.     Imperfect Self-Defense

The Court's conclusions regarding self-defense likewise require rejection of Defendants' imperfect self-defense claims.

Under Pennsylvania law, a successful defense of "imperfect self-defense" to a murder charge results in the crime of "unreasonable belief voluntary manslaughter," defined as follows:

> A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title (relating to general principles of justification), but his belief is unreasonable.

18 Pa. Cons. Stat. § 2503(b).  In describing imperfect self-defense, the Pennsylvania Supreme Court stated:

> This self-defense claim is imperfect in only one respect -- an unreasonable rather than a reasonable belief that deadly force was required to save the actor's life. All other principles of justification under 18 Pa. C.S. § 505 must [still be met in order to establish] unreasonable belief voluntary manslaughter.

*Commonwealth v. Tilley*, 528 Pa. 125, 141 (1991).

Since Defendants cannot establish the other principles of justification, they are not entitled to an instruction on imperfect self-defense as to count one.  For the same reason, Defendants are not entitled to an instruction on imperfect self-defense as to counts six and

---

[5] The court in *Haynes* ultimately grounded its decision on the finding that the defendant had reasonable alternatives to the use of force.  *Id.* at 1090-91.  Although the Ninth Circuit has expressly rejected the absence of reasonable alternatives to force as a requirement of self-defense, *Biggs*, 441 F.3d at 1071, the discussion of imminence in *Haynes* remains illuminating.

seven.[6]

## VI.   Duress

### A.   Count One

#### 1.   Legal Standard

Under Pennsylvania law, a defendant is entitled to a defense of duress where he committed a crime "because he was coerced to do so by the use of, or threat to use, unlawful force against his person or the person of another, which a person of reasonable firmness in his situation would have been unable to resist." 18 Pa. Cons. Stat. § 309(a). This duress defense is applicable to first degree murder. *Commonwealth v. Markman*, ___ Pa.___ , 916 A.2d 586, 606 (2007) ("Although at common law duress was not available as to a charge of first-degree murder, Section 309 does not create an exception for any particular offense.") (internal citation omitted).

"[T]o establish the duress defense under Section 309, unlike under the common law rule,

---

[6] At oral argument on April 26, 2007, counsel for Defendants also requested instructions on voluntary manslaughter based on provocation and second degree murder. Under Pennsylvania law, a person "commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by . . . the individual killed . . . ." 18 Pa. Cons. Stat. § 2503(a). There is absolutely no evidence to support a finding of provocation by Salaam or Joyner. The result is the same under federal law. *See* 18 U.S.C. § 1112(a) (defining voluntary manslaughter); *United States v. Collins*, 690 F.2d 431, 437 (5th Cir. 1982) ("[T]he provocation must be such as would arouse a reasonable and ordinary person to kill someone").

Pennsylvania defines second degree murder as a criminal homicide "committed while defendant was engaged as a principal or an accomplice in . . . the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping." 18 Pa. Cons. Stat. § 2502. There is no allegation that Defendants were engaged in any such offense so an instruction on second degree murder would plainly be inapplicable to count one. As to counts six and seven, an instruction would serve no purpose because a finding of second degree murder would also support a VICAR conviction. *See United States v. Mapp*, 170 F.3d 328, 335-36 (2d Cir. 1999) (holding second degree murder can serve as the basis for VICAR conviction since "it is sufficient for the government to prove that the defendant committed murder – however that crime is defined by the underlying state or federal law").

the force or threatened force does not need to be of present and impending death or serious bodily injury.  Instead, the relevant inquiry under Section 309 is whether the force or threatened force was a type of unlawful force that 'a person of reasonable firmness in [the defendant's] situation would have been unable to resist.'"  *Commonwealth v. Demarco*, 570 Pa. 263, 272 (2002).

There is, however, an exception to Section 309(a).  "The defense provided by subsection (a) of this section is unavailable if the actor recklessly placed himself in a situation in which it was probable that he would be subjected to duress."  18 Pa. Cons. Stat. § 309(b).  For purposes of Section 309(b), recklessly is defined as follows:

> A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa. Cons. Stat. § 302(b)(3).

## 2. Analysis

Defendants claim that Benton, a seasoned and high-ranking A.B. member, would have killed them if they refused to assist him in the killings.  Benton testified that he would have done so.  Critically, however, there is no evidence that Benton ever threatened either Defendant in any way before the killings.  Defendants instead rely on a generalized threat, arguing that it was well known that the A.B. would kill those who refused to comply with its orders, so that the threat, though unspoken, was nonetheless implied.  Testimony from multiple witnesses regarding the rules and practices of the A.B. supports this assertion.

Accepting this type of generalized threat as sufficient would greatly expand the law of duress in the gang context and again promote the "law of the jungle" over that of civilized society.  Yet the Court need not determine whether Defendants have satisfied the threat element of a duress defense because each Defendant falls within the exception as each "recklessly placed himself in a situation in which it was probable that he would be subjected to duress."  18 Pa. Cons. Stat. § 309(b).

In *Commonwealth v. Pelzer*, 531 Pa. 235 (1992), the Pennsylvania Supreme Court determined that, as a matter of law, a duress defense was not available to the defendant because the defendant's actions constituted recklessness. *Id.* at 248.  There, the defendant failed to take advantage of numerous opportunities to escape the alleged source of his duress and voluntarily returned to continue the crime after having left the crime scene.

Similarly, all parties here agree that hours passed between the time that Benton asked Defendants to participate in the killings and the time of the killings.  During this time, both Defendants left Benton's presence.  Critically, neither took advantage of opportunities to escape Benton's alleged control by seeking to enter protective custody with the staff at USP Lewisburg.

Defendant Bridgewater first learned of the plot after Benton and he heated up a letter to reveal a hidden war message and Benton told Bridgewater that the A.B. would kill as soon as possible.  Hours passed between Bridgewater learning of the plan to kill and the actual killings.  Yet, in response, rather than seeking protection from prison staff, Bridgewater left Benton's control to recruit two individuals to participate in the attacks, whom Benton did not want to participate, before returning.  Bridgewater also retrieved the very prison-made knives used in the attacks, which, presumably, Benton would have used against him.  Thus, Bridgewater not only recklessly returned to the source of his duress, he also facilitated his own alleged duress by retrieving the weapons.

As to Defendant Houston, videotape evidence shows him entering cell block A, where the killings occurred, after leaving his cell block, in violation of prison rules.  Benton had told Houston of the plan to kill D.C. Blacks in the yard that morning.  Thus, Houston entered cell block A knowing that Benton was housed there and knowing that Benton and other A.B. members there were going to kill black inmates.  After intentionally placing himself in cell block A, Houston thereafter participated in the killings.

Pennsylvania case law finding sufficient evidence to allow the jury to decide whether a defendant has acted recklessly is distinguishable.  The Court in *Markman* distinguished the facts before it from those in *Pelzer*.  While there was evidence that the defendant in *Markman* missed opportunities to flee, there was no evidence that the defendant had entirely removed herself from

the situation, making the case "qualitatively different from *Pelzer*." 916 A.2d at 609.  Moreover, in *Markman*, defendant's "trial testimony set out at length the basis for her claim of duress, including that [her boyfriend] repeatedly battered her and placed a knife to her throat or side and threatened her with death if she did not do as he instructed." *Id.* at 607.

In contrast, where, as here, a defendant has removed himself from a situation only to later return and supply killing instruments, no reasonable jury could determine that the defendant had not "recklessly placed himself in a situation in which it was probable that he would be subjected to duress." 18 Pa. Cons. Stat. § 309(b).[7]

## B.   Counts Six and Seven

### 1.   Applicability of Duress to VICAR Murder

In *United States v. LaFleur*, 971 F.2d 200, 206 (9th Cir. 1992), the Ninth Circuit stated: "[w]e are persuaded that duress is not a valid defense to § 1111(a) first degree murder.  We believe that, consistent with the common law rule, a defendant should not be excused from taking the life of an innocent third person because of the threat of harm to himself."  There is no decision, either in the Ninth Circuit or elsewhere, on the issue of whether duress is a defense to

---

[7] In addition to the fact that Defendant Bridgewater essentially embraced Benton's alleged control, he also acceded to the possibility of being subject to duress by voluntarily associating himself with the A.B., a group well-known for killing individuals for failure to comply with its commands.  The evidence has established that Defendant Bridgewater has been a member of the A.B. since the early 1980s, and there has been no indication that he ever tried to leave the gang.  The Government has also established that Defendant Houston associated himself with the A.B. for years prior to the killings and was made a member of the A.B. mere hours beforehand.  The Court notes that the Pennsylvania Supreme Court has suggested that a duress instruction may be inappropriate when the defendant has been subjected to duress after joining a prison gang, stating:

> We acknowledge that, under some circumstances, placing one's self into a certain cooperative relationship with other violent individuals may constitute recklessness, even where no specific crime is in view.  For example, the court in *People v. Anderson*, 28 Cal. 4th 767, 122 Cal. Rptr. 2d 587, 50 P.3d 368, 374 (Cal. 2002), suggested that the duress defense may be unavailable to a person who joins a street gang or prison gang and is then coerced to commit a crime.

*Markman*, 916 A.2d at 610 n.19.

VICAR murder, which is essentially § 1111(a) murder with an additional element that concerns the defendant's reason for committing the murder.

There are two theories regarding the operation of the duress defense.  Normally, duress serves as an affirmative defense that excuses otherwise criminal conduct without negating any element of the offense.  In *Dixon v. United States*, ___ U.S. ___ , 126 S. Ct. 2437 (2006), the Supreme Court stated:

> The duress defense . . . may excuse conduct that would otherwise be punishable, but the existence of duress normally does not controvert any of the elements of the offense itself . . . . [T]he defense of duress does not negate a defendant's criminal state of mind when the applicable offense requires a defendant to have acted knowingly or willfully; instead, it allows the defendant to "avoid liability . . . because coercive conditions or necessity negates a conclusion of guilt even though the necessary mens rea was present."

*Id*. at 2441-42.[8]  While duress does not negate a knowing or willful state of mind, the Supreme Court explained that "there may be crimes where the nature of the mens rea would require the Government to disprove the existence of duress beyond a reasonable doubt."  *Id*. at 2442 n.4.[9]

---

[8]  *See also United States v. Solorzano-Rivera*, 368 F.3d 1073, 1079-80 (9th Cir. 2004), stating:

> Generally, the affirmative defense of duress does not negate the mental states of knowledge or intent, or the voluntary nature of a criminal act.  A person who acts under duress to harm another generally "knows that his actions will lead to injury or that his purpose is to cause injury."  But he nevertheless acts "in order to comply with the demands of another."  A person, for example, "could intend to drive a truck with undocumented aliens to further their illegal presence in the United States, but act in that manner because someone had a gun to his head."  Thus, "even though he has done the act the crime requires and has the mental state which the crime requires, his conduct which violates the literal language of the criminal law is excused because he 'lacked a fair opportunity to avoid acting unlawfully.'"

(*citing* Wayne R. LaFave, Substantive Criminal Law § 9.7(a) (2d ed. 2003) (*quoting* Joshua Dressler, *Exegesis of the Law of Duress: Justifying the Excuse and Searching for Its Proper Limits*, 62 So. Cal. L. Rev. 1331, 1365 (1989))).

[9] The only type of mens rea that would logically fit into this category is one that legally cannot co-exist with the mental state caused by duress.  VICAR murder seems to

The Supreme Court then cited the common-law crimes that require malice as possible examples of such crimes. *Id.* Since "malice aforethought" is a component of federal murder, *LaFleur* should be read as holding only that duress cannot legally excuse a murder charge once all elements are proven. It does not stand for the proposition that duress, if it negated malice, would not constitute a proper defense to murder. Nothing in *LaFleur* suggests that the holding is limited to the former or as broad as the latter, but the Constitution seems to require the narrower holding. *See United States v. Toney*, 27 F.3d 1245, 1250-51 (7th Cir. 1994) ("[I]f a substantive defense negates an essential element of a crime, the prosecution must disprove the defense beyond a reasonable doubt."); *Walker v. Endell*, 850 F.2d 470, 472 (9th Cir. 1987) ("Due process requires that the prosecution prove every element of a crime beyond a reasonable doubt.").

The Court is, of course, bound by Ninth Circuit precedent. *Zuniga v. United Can Co.*, 812 F.2d 443, 450 (9th Cir. 1987). It therefore declines to embrace an unconfirmed interpretation of *LaFleur*. The resolution of this issue does not effect the Court's ultimate conclusion because even assuming, without deciding, that duress may sometimes be available as a defense to VICAR murder, Defendants have not established a *prima facie* case of applicability here.

## 2.    Legal Standard

A defendant "must establish three elements in order to present [a duress] defense: (1) an immediate threat of death or serious bodily injury, (2) a well-grounded fear that the threat will be carried out, and (3) lack of a reasonable opportunity to escape the threatened harm." *United*

---

be a crime with such an atypical mens rea requirement, above and beyond the intent required for normal murder. The VICAR statute requires proof that the defendant committed the crime "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity . . . ." 18 U.S.C. § 1959(a). This mental state is in addition to and distinguishable from the intent to kill required for the underlying murder charge. If a person murders someone due to duress, he necessarily has not done so in order to gain entrance to or maintain or increase his position in a racketeering enterprise.

1 | *States v. Moreno*, 102 F.3d 994, 997 (9th Cir. 1996).

2 | ### 3. Analysis

3 | The Court's discussion on Defendants having recklessly placed themselves into a position

4 | in which they would be subject to duress is relevant to the consideration of whether there was a

5 | reasonable opportunity to escape the threatened harm.  Without restating all of the relevant facts,

6 | Defendants' own version of the facts reveals repeated failed opportunities to evade Benton's

7 | control.

8 | In addition, the facts do not support an immediate threat of harm from Benton, because

9 | there has been no allegation that Benton would have killed Defendants on the spot.  As with self-

10 | defense, the immediacy requirement of duress is defined narrowly under federal law.  For

11 | instance, in *United States v. Tokash*, 282 F.3d 962 (7th Cir. 2002),  the Seventh Circuit

12 | addressed the issue of what constitutes an "imminent threat" in prison.  Tokash was prosecuted

13 | for possession of a weapon in prison after a knife was found in his rectum.  The trial judge

14 | refused to allow evidence on the defense of necessity raised by Tokash.  The Seventh Circuit

15 | affirmed, concluding that the word "imminent" should be construed narrowly in the prison

16 | context.  *Id*. at 971.  The court determined that a prisoner must demonstrate "the threat was

17 | immediate and that there was no reasonable alternative to violating the law."  *Id*. at 971.  *See*

18 | *also United States v. Bell*, 214 F.3d 1299, 1301 (11th Cir. 2000) (noting that the justification

19 | defense is reserved for "extraordinary circumstances" that "require nothing less than immediate

20 | emergency.");  *United States v. Atencio*, 586 F.2d 744, 746 (9th Cir. 1978) ("element of

21 | immediacy requires some evidence that such injury was present, immediate or impending");

22 | *United States v. Becerra*, 992 F.2d 960, 964 (9th Cir. 1993) (holding that immediacy did not

23 | exist where a mobster threatened to "take care of" defendant's family if deal did not go through).

24 | ## VII.   Conclusion

25 | For these reasons, Defendants' requests that the jury be instructed on self-defense,

26 | imperfect self-defense, and duress are **DENIED**.

27 | However, Defendants will still be allowed to argue to the jury that the Government has

28 | not proven beyond a reasonable doubt that Defendants committed the killings in order to gain

1  entrance to or maintain or increase Defendants' status in the A.B.  This issue – the reason for

2  Defendants' actions – is narrower in scope than the asserted defenses and is a question in this

3  trial which Defendants may address.  Therefore, the Government's motion is **DENIED** to the

4  extent it seeks to prevent defense counsel from arguing to the jury that the killings were

5  committed out of fear of Benton or the D.C. Blacks.[10]  Finally, Defendants also will be permitted

6  to argue these issues as mitigating factors during the penalty phase of the trial, if such phase

7  becomes necessary.

8

9  DATED: April 30, 2007

10

11

12                                      DAVID O. CARTER

13                                   United States District Judge

14

15

16

17

18

19

20

21

22

23

24  ─────────────────

25      [10] Since these defenses are not available as a matter of law, should the jury inquire
    of the Court during deliberations as to a definition of "duress" or "self-defense," the
26  Court may inform the jury that such terms are irrelevant to their deliberations and are not
    applicable to this case.  Counsel should be careful with the language they choose to use
27  before the jury, in order to avoid giving a false impression that these legal defenses are
    somehow applicable, thereby inviting questions from the jury.
28